

FILED
CLERK, U.S. DISTRICT COURT

JUN 2 0 2018

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2018 Grand Jury

| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>RUBEN FILIAN,<br><br>          Defendant. | No. **18CR00374**-JFW<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1349: Conspiracy to Commit Health Care Fraud; 18 U.S.C. § 1347: Health Care Fraud; 18 U.S.C. § 371: Conspiracy to Solicit, Receive, and Pay Illegal Remuneration for Health Care Referrals; 42 U.S.C. § 1320a-7b(b)(1)(A): Illegal Remuneration for Health Care Referrals; 18 U.S.C. § 1956(a)(1)(B)(i): Money Laundering; 18 U.S.C. § 2: Aiding and Abetting and Causing an Act to be Done; 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), 982(a)(7), 28 U.S.C. § 2461(c): Criminal Forfeiture] |

The Grand Jury charges:

## COUNT ONE

[18 U.S.C. §§ 1349, 2]

A.   INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

1.    Defendant RUBEN FILIAN ("FILIAN") was a resident of Glendale, California, within the Central District of California. Defendant FILIAN was a physician assistant ("PA") licensed to practice in California.

2.    Defendant FILIAN maintained at least five bank accounts in his name.  Defendant FILIAN was the sole signatory on accounts in his name at U.S. Bank, including one account ending in 1394 ("FILIAN USB x1394"), which was opened on or about December 9, 2011, and one account ending in 8448 ("FILIAN USB x8448"), which was opened on or about December 17, 2013. Defendant FILIAN was the sole signatory on two accounts at Bank of America in his name, including one account ending in 9440 ("FILIAN BOA x9440"), which was opened on or about April 9, 2015, and one account ending in 4580 ("FILIAN BOA x4580"), which was opened on or about July 5, 2015.  Defendant FILIAN was the sole signatory on one account at JPMorgan Chase Bank in his name, an account ending in 0368 ("FILIAN JPM x0368"), which was opened on or about March 1, 2017.

3.    Defendant FILIAN registered Volkadon Capital, LLC ("Volkadon") with the California Secretary of State in or about January 2011, and listed himself as the incorporator and the agent for service of process.  In or about November 2017, L.F. filed a Statement of Information with the California Secretary of State, and listed L.F. as the Chief Executive Officer and registered agent for service of process.  Volkadon had two Wells Fargo Accounts, one account ending in 0910 ("Volkadon WF x0910") and another account ending in 9620 ("Volkadon WF x9620"), both of which were opened on or about June 20, 2011, and listed

defendant FILIAN as the sole signatory.   In or about August 2013, L.F. was added as a signatory to the accounts, and the purpose of the business was listed as "Real Estate Investment."

4.   Defendant FILIAN registered Quadratum, Inc. ("Quadratum") with the California Secretary of State in or about June 2012, and listed himself as the sole incorporator. Quadratum had the following bank accounts: one Bank of America account ending in 2076 ("Quadratum BOA x2076"), opened on or about April 4, 2013, on which defendant FILIAN is listed as the President of Quadratum; and U.S. Bank account ending in 8244 ("Quadratum USB x8244"), opened on or about July 17, 2012, on which the purpose of the business is listed as "Real Estate Investment."   Defendant FILIAN is the sole signatory on both Quadratum BOA x2076 and Quadratum USB x8244.

5.   Defendant FILIAN registered Karabell, Inc. ("Karabell") with the California Secretary of State in or about May 2017, and listed himself as the incorporator and the agent for service of process.   In or about February 2018, defendant FILIAN filed a Statement of Information with the Secretary of State, and listed himself as the Chief Executive Officer, Secretary, and Chief Financial Officer of Karabell.   Karabell had a bank account at JPMorgan Chase, account ending 3019 ("Karabell JPM x3019"), opened on or about June 13, 2017, on which defendant FILIAN was the sole signatory and was listed as Karabell's President.

6.   Co-conspirator Stephen Levine, M.D. ("Levine"), employed defendant FILIAN between in or about August 2013 and December 2017 as an independent contractor to conduct physical

exams and face-to-face evaluations of individuals enrolled in Medicare at their homes to assess the individuals for home health care services.

The Medicare Program

7.    Medicare was a federally-funded health insurance program that provided funds for health care services provided to individuals aged 65 or above, and to certain disabled persons. The U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS") administered the Medicare program, which was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

8.    The individuals who were enrolled in the Medicare program were referred to as "beneficiaries." Medicare beneficiaries were issued beneficiary identification cards that certified eligibility for Medicare and identified each beneficiary by a unique health identification card number ("HIC number").

9.    Home health agencies ("HHAs"), physicians, PAs, and other health care providers that provide medical services that were to be reimbursed by Medicare were referred to as Medicare "providers." To participate in the Medicare program, providers were required to submit an application in which the provider agreed to comply with all Medicare-related laws and regulations, including the anti-kickback statute (42 U.S.C. § 1320a-7b(b)), which proscribed the offering, payment, solicitation, or receipt of any remuneration in exchange for a patient referral or referral of other business for which payment may be made by any federal health care program.  If Medicare approved the

4

provider's application, Medicare assigned the provider a
Medicare "provider number" which was used for submitting,
processing, and paying claims.

10.  Home health care was supportive health care that was
provided to patients in their homes.  Home health care was
prescribed by a treating physician to a patient if the patient
had developed an illness or injury that required skilled care
but not at the level provided by an acute facility such as a
hospital or at a residential skilled nursing facility.  Home
health services might include changing wound dressings, giving
injections, or teaching a patient's family member to properly
care for a patient recently discharged from the hospital.

11.  To have qualified for the Medicare home health
benefit, a beneficiary must have been confined to his or her
home, been under the care of a physician, received services
under a CMS Form 485 Home Health Certification and Plan of Care
("485" or "POC"), established and periodically reviewed by a
physician and have been in need of skilled nursing care on an
intermittent basis, or physical therapy, or speech-language
pathology, or have had a continuing need for occupational
therapy.

12.  A patient was considered to be confined to his or her
home ("homebound") if the patient was generally unable to leave
home, such that leaving home required a considerable and taxing
effort.  In addition, the patient must either, because of
illness or injury, have needed the aid of supportive devices
such as a cane, walker, wheelchair, or the use of special
transportation, or required the assistance of another person in

order to leave his or her residence, or had a condition such that leaving his or her home was medically contraindicated.

13.   Prior to the start of care, a physician, registered nurse, or qualified therapist must have completed an assessment of the patient, using the Outcome and Assessment Information Set ("OASIS") created by CMS.   The OASIS was a group of data elements that represented core items of a comprehensive assessment for an adult home care patient.   Its purpose was to provide a standardized assessment tool.   The information gathered during the assessment was then used to create the 485 for that patient.   A 485 had to indicate the type of services to be provided to the patient, both with respect to the professional who would provide them and the nature of the individual services, as well as the frequency of the services.

14.   The skilled nursing services were covered by Medicare if the services were reasonable and necessary for the diagnosis and treatment of the patient's illness or injury and were necessary to maintain the patient's current condition or prevent or slow further deterioration.   The services must have required specialized judgment, knowledge or the skills of a registered nurse or licensed practical (vocational) nurse under the supervision of a registered nurse.   The services must have been so inherently complex that the service could only be safely and effectively performed by, or under the supervision of, a professional.   Examples include intravenous medications, intramuscular injections, insertion of a catheter or respiratory treatments.

15.   Physical therapy, speech-language pathology, or occupational therapy must be reasonable and necessary to the treatment of the patient's illness or injury or for the restoration or maintenance of function affected by the patient's illness or injury.  To be reimbursable by Medicare, the services must have been those that were inherently complex and required a skilled therapist in order to safely and/or effectively perform the service.  The services must have required the specialized skill, knowledge, and judgment of a therapist.  Services involving activity for the general welfare of any patient, such as general exercises to promote overall fitness or flexibility or activities to provide diversion or general motivation did not constitute skilled therapy.

The Claims Process

16.   HHAs that provided reasonable and necessary services to Medicare beneficiaries could submit claims for reimbursement to the Medicare program. In order for the HHA to initiate home health care services, a physician must have certified that the above Medicare requirements, among others, were met.

17.   The services that an HHA provided to the patient were based upon the 485, which must have been reviewed and signed by a physician.  The 485 must have been reviewed and signed by the physician who established the 485, in consultation with the HHA's professional personnel, at least every 60 days.  CMS permitted continuous 60-day episodes of home health care for beneficiaries who continued to be eligible for home health benefits.

18.   A provider could submit a claim to Medicare through the mail or electronically.  Most providers submitted their claims electronically pursuant to an agreement they executed with Medicare in which the providers agreed that they were responsible for all claims submitted to Medicare by themselves, their employees, and their agents; that they would submit claims only on behalf of those Medicare recipients who had given their written authorization to do so; and that they would submit claims that were accurate, complete, and truthful.  If the provider submitted by mail, the provider had to agree to the same conditions.  Medicare would cover such services only if the services were medically necessary and were actually provided to the Medicare beneficiaries.

B.   OBJECT OF THE CONSPIRACY

19.   Beginning in or around August 2013 and continuing through at least in or around December 2017, in Los Angeles and Ventura Counties, within the Central District of California, and elsewhere, defendant FILIAN and others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed to commit health care fraud, in violation of Title 18, United States Code, Section 1347.

C.   MANNER AND MEANS OF THE CONSPIRACY

20.   The object of the conspiracy was carried out, and to be carried out, in substance, as follows:

Employment with Dr. Stephen Levine

a.   Defendant FILIAN was employed as an independent contractor for co-conspirator Levine to conduct physical exams

and face-to-face evaluations of Medicare beneficiaries at their homes to assess the patient for home health services.

b.   HHAs would provide co-conspirator Levine or defendant FILIAN with beneficiary information for patients to be assessed for home health services.

c.   Co-conspirator Levine or defendant FILIAN would visit patients to gather the patient histories, conduct physical exams, and complete face-to-face evaluations, or would complete the face-to-face evaluations without visiting the patient.  If defendant FILIAN completed the examination and face-to-face evaluation, and other forms, he would sign the forms and would falsely represent that the beneficiaries were homebound or otherwise met the criteria for Medicare to pay for home health care, when in fact, as defendant FILIAN then well knew, the beneficiaries did not meet those criteria.  Defendant FILIAN would then bring those forms to co-conspirator Levine to sign.

d.   In truth and in fact, as defendant FILIAN, co-conspirator Levine, and other co-conspirators at the HHAs then knew, many of these beneficiaries had never been seen or evaluated by defendant FILIAN, co-conspirator Levine, or by any qualified professional that worked for co-conspirator Levine to assess their need for home health care, or did not meet the criteria for Medicare to pay for the care.

e.   After co-conspirator Levine signed the fraudulent forms that defendant FILIAN presented to him, defendant FILIAN would take the resulting orders for home health care to the HHAs, and the HHAs' agents would complete 485s which the HHA agents would give back to defendant FILIAN.  Defendant FILIAN

1 would then bring the 485s back to co-conspirator Levine for his

2 signature.  Defendant FILIAN would return the signed documents

3 to the HHAs.

4        f.    Co-conspirator Levine would bill Medicare for the

5 patient visits for patients whose face-to-face evaluations had

6 been completed by defendant FILIAN.  Co-conspirator Levine would

7 pay defendant FILIAN $100 to $150 via check to defendant FILIAN

8 or Quadratum for each patient visit.

9 Payments from HHAs

10        g.    In exchange for referring Medicare beneficiaries

11 for home health services, defendant FILIAN would receive

12 kickback payments from co-conspirators at various HHAs, in the

13 form of checks made out directly to defendant FILIAN or to the

14 entities he controlled, namely, Quadratum, Karabell, or

15 Volkadon.  Defendant FILIAN would give a portion of the kickback

16 payments in cash to co-conspirator Levine, who also received

17 payments directly from co-conspirators at various HHAs.

18 Defendant FILIAN would orchestrate the cash kickback payments

19 between some of the HHAs and co-conspirator Levine.

20        h.    Between at least in or about August 2013 and

21 October 2017, defendant FILIAN would deposit kickback checks

22 into at least seven banking accounts in his name and in the name

23 of Quadratum, Karabell, or Volkadon.  The HHAs that provided

24 approximately $1 million of these kickback checks billed

25 Medicare for providing home health care with co-conspirator

26 Levine as the attending or referring physician.

27 Scope of the Conspiracy

28        i.    Between August 2013 and December 2017,

approximately 164 HHAs billed Medicare for providing home health care with co-conspirator Levine as the attending or referring physician for approximately 5,350 distinct beneficiaries. During that time period, Medicare paid approximately $58 million to these HHAs for claims on which co-conspirator Levine was the attending or referring provider.  Defendant FILIAN was responsible for examining an estimated 60% of those beneficiaries, amounting to approximately 3,200 beneficiaries and approximately $35 million paid by Medicare.

COUNTS TWO THROUGH FIVE

[18 U.S.C. §§ 1347, 2]

21.   The Grand Jury hereby repeats, realleges, and incorporates by reference paragraphs 1 through 18 and 20 of this Indictment as though fully set forth herein.

A.   THE SCHEME TO DEFRAUD

22.   Beginning in or about August 2013, and continuing until at least in or about December 2017, in Los Angeles and Ventura Counties, within the Central District of California, and elsewhere, defendant FILIAN, together with co-schemer Levine and others known and unknown to the Grand Jury, knowingly, willfully, and with the intent to defraud, executed, attempted to execute, and willfully caused to be executed a scheme and artifice: (1) to defraud a health care benefit program, namely, Medicare, as to material matters in connection with the delivery of and payment for health care benefits, items, and services; and (2) to obtain money from Medicare by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts in connection with the delivery of and payment for health care benefits, items, and services.

B.   MEANS TO ACCOMPLISH THE SCHEME TO DEFRAUD

23.   The fraudulent scheme operated, in substance, as described in paragraph 20 of this Indictment.

C.   EXECUTIONS OF THE FRAUDULENT SCHEME

24.   On or about the dates set forth below, within the Central District of California, and elsewhere, defendant FILIAN, together with others known and unknown to the Grand Jury, knowingly and willfully executed and attempted to execute the

12

fraudulent scheme described above by completing and signing
face-to-face evaluations ("F2F EVAL") for the beneficiaries
identified below, which contained false information, and which
were then used by co-conspirators at the HHAs identified below
to submit false and fraudulent claims to Medicare for home
health care services:

| COUNT | BENEFICIARY | DATE ON F2F EVAL | HHA THAT BILLED MEDICARE | AMT HHA BILLED TO MEDICARE |
|-------|-------------|------------------|--------------------------|----------------------------|
| TWO   | G.R.        | 6/28/2015        | HHA-1                    | $2,220                     |
| THREE | C.R.        | 6/24/2015        | HHA-1                    | $2,500                     |
| FOUR  | M.H.        | 3/1/2016         | HHA-2                    | $1,780                     |
| FIVE  | R.H.        | 3/2/2016         | HHA-2                    | $1,080                     |

COUNT SIX

[18 U.S.C. § 371]

25.   The Grand Jury hereby repeats, realleges, and incorporates by reference paragraphs 1 through 18 and 20 of this Indictment as though fully set forth herein.

A.   OBJECT OF THE CONSPIRACY

26.   Beginning in or around August 2013 and continuing through in or around December 2017, in Los Angeles and Ventura Counties, within the Central District of California, and elsewhere, defendant FILIAN, co-conspirator Levine, and others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed to commit the following offenses against the United States:

a.   Knowingly and willfully soliciting and receiving remuneration in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A); and

b.   Knowingly and willfully offering to pay and paying any remuneration to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A).

B.   MANNER AND MEANS OF THE CONSPIRACY

27.   The objects of the conspiracy were carried out, and to

14

be carried out as described in paragraph 20 of this Indictment.

C.   OVERT ACTS

28.   On or about the following dates, in furtherance of the conspiracy and to accomplish its objects, defendant FILIAN, together with co-conspirator Levine and others known and unknown to the Grand Jury, committed and willfully caused others to commit the following overt acts, among others, within the Central District of California and elsewhere:

Overt Act No. 1:   On or about August 17, 2015, defendant FILIAN endorsed and deposited a check for $800 dated August 17, 2015, written from HHA-4 to defendant FILIAN, into FILIAN USB x8448.   This check was payment for certifying four patients to HHA-4 for home health care.

Overt Act No. 2:   On or about September 16, 2015, defendant FILIAN signed and deposited a check for $400 dated September 15, 2016, written from HHA-4 to defendant FILIAN, into FILIAN USB x8448.   This check was payment for certifying two patients to HHA-4 for home health care.

Overt Act No. 3:   On or about March 7, 2016, defendant FILIAN signed and deposited a check dated March 7, 2016, in the amount of $8,500, written from HHA-2 to defendant FILIAN, into Quadratum USB x8244.   This check was payment for the referral of Medicare beneficiaries that defendant FILIAN caused Levine to certify to receive home health care from HHA-2.

Overt Act No. 4:   On or about May 19, 2016, defendant FILIAN signed and deposited a check for $200 dated May 19, 2016, written from HHA-4 to defendant FILIAN, into FILIAN USB x8448.

This check was payment for certifying one patient to HHA-4 for home health care.

    Overt Act No. 5:    On or about July 28, 2017, defendant FILIAN deposited a check dated July 27, 2017, in the amount of $2,750, written from HHA-3 to Karabell, into Karabell JPM x3019. This check was payment for the referral of Medicare beneficiaries that defendant FILIAN caused Levine to certify to receive home health care from HHA-3.

    Overt Act No. 6:    On or about August 8, 2017, defendant FILIAN gave co-conspirator Levine approximately $200 in cash as payment for certifying one patient to HHA-3 for home health care.

    Overt Act No. 7:    On or about August 23, 2017, defendant FILIAN gave co-conspirator Levine approximately $150 in cash as payment for certifying one patient to HHA-3 for home health care.

    Overt Act No. 8:    On or about September 28, 2017, defendant FILIAN endorsed and deposited a check for $3,300 dated September 28, 2017, written from HHA-4 to Karabell into Karabell JPM x3019.  This check was payment for the referral of Medicare beneficiaries that defendant FILIAN caused co-conspirator Levine to certify to receive home health care from HHA-4.

    Overt Act No. 9:    On or about October 3, 2017, defendant FILIAN gave Levine approximately $1,800 in cash as payment for certifying nine patients to HHA-4 for home health care.

COUNTS SEVEN THROUGH NINE

[42 U.S.C. § 1320a-7b(b)(1)(A); 18 U.S.C. § 2(b)]

29.  The Grand Jury hereby repeats, realleges, and incorporates by reference paragraphs 1 through 18, 20 and 28 of this Indictment as though fully set forth herein.

30.  On or about the dates set forth below, in Los Angeles and Ventura Counties, within the Central District of California, and elsewhere, defendant FILIAN knowingly and willfully received and caused to be received remuneration, namely, checks in the amounts identified below, which constituted kickbacks to defendant FILIAN for referring patients to various HHAs, for which payment could be made in whole and in part under a Federal health care program, namely, Medicare:

| COUNT | DATE | PAYOR | PAYEE | AMOUNT |
|-------|------|-------|-------|--------|
| SEVEN | 3/7/2016 | HHA-2 | Quadratum | $8,500 (Check No. 2472) |
| EIGHT | 7/27/2017 | HHA-3 | Karabell | $2,750 (Check No. 1266) |
| NINE | 9/28/2017 | HHA-4 | Karabell | $3,300 (Check No. 1463) |

COUNTS TEN AND ELEVEN

[42 U.S.C. § 1320a-7b(b)(2)(A); 18 U.S.C. § 2(b)]

31.   The Grand Jury hereby repeats, realleges, and incorporates by reference paragraphs 1 through 18, 20, and 28 of this Indictment as though fully set forth herein.

32.   On or about the dates set forth below, in Los Angeles and Ventura Counties, within the Central District of California, and elsewhere, defendant FILIAN knowingly and willfully paid and provided to Levine, and caused to be paid and provided to Levine, remuneration, namely, cash in the amounts identified below, which constituted kickbacks to Levine for referring patients to various HHAs, for which payment could be made in whole and in part under a Federal health care program, namely, Medicare:

| COUNT | DATE | PAYOR | PAYEE | AMOUNT |
|-------|------|-------|-------|--------|
| TEN | 8/23/2017 | FILIAN | Levine | $150 (cash) |
| ELEVEN | 10/3/2017 | FILIAN | Levine | $1,800 (cash) |

COUNTS TWELVE THROUGH FOURTEEN

[18 U.S.C. §§ 1956(a)(1)(B)(i), 2]

33.   The Grand Jury hereby repeats, realleges, and incorporates by reference paragraphs 1 through 20, 22 through 24, 26 through 28, 30, and 32 of this Indictment as though fully set forth herein.

34.   On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant FILIAN, knowing that the property involved in each of the following financial transactions represented the proceeds of some form of unlawful activity, conducted, attempted to conduct, aided and abetted and willfully caused to be conducted the following financial transactions affecting interstate and foreign commerce, which transactions in fact involved the proceeds of specified unlawful activity, namely, health care fraud, in violation of Title 18, United States Code, Section 1347; conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349; and conspiracy to pay and receive illegal remunerations, in violation of Title 18, United States Code, Section 371, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity:

//
//
//
//

| COUNT | DATE | FINANCIAL TRANSACTION |
|-------|------|----------------------|
| TWELVE | 4/5/2014 | The deposit of check number 1092, written from Volkadon WF x0910 to Quadratum and dated April 4, 2014, for $60,000, into Quadratum BOA x2076. |
| THIRTEEN | 6/17/2014 | The deposit of check number 1091, written from Quadratum USB x8244 to Volkadon and dated June 9, 2014, for $20,000, into Volkadon WF x0910. |
| FOURTEEN | 9/28/2017 | The deposit of check number 1463 from HHA-4 for $3,300 made payable to Karabell and dated September 28, 2017, into Karabell JPM x3019. |

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction under Count One of this Indictment.  The defendant, if so convicted, shall forfeit the following:

a.    All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of any such offense;

b.    any personal property used or intended to be used to commit the offense; and

c.    To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs a and b.

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), and Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a

third party; (c) has been placed beyond the jurisdiction of the
court; (d) has been substantially diminished in value; or (e)
has been commingled with other property that cannot be divided
without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982(a)(7) and 28 U.S.C. § 2461(c)]

1.      Pursuant to Rule 32.2(a), Fed. R. Crim. P., notice is hereby given that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982(a)(7) and Title 28, United States Code, Section 2461(c), in the event of defendant's conviction under any of Counts Two through Eleven of this Indictment.  The defendant, if so convicted, shall forfeit the following:

        a.      All right, title, and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of any offense of conviction; and

        b.      To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph a.

2.      Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(b), the defendant shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as a result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e)

has been commingled with other property that cannot be divided without difficulty.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 982(a)(1) and 28 U.S.C. § 2461(c)]

1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1), and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction under any of Counts Twelve through Fourteen of this Indictment.  The defendant, if so convicted, shall forfeit the following:

(a)   Any property, real or personal, involved in such offense, and any property traceable to such property; and

(b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph a.

2.   Pursuant to Title 21, United States Code, Section 853(p) and Title 18, United States Code, Section 982(b)(2), the defendant shall forfeit substitute property, if, by any act or omission of the defendant, the property described in paragraph 1, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has

//

//

//

//

//

been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/S/

Foreperson

NICOLA T. HANNA
United States Attorney


LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

STEPHEN A. CAZARES
Assistant United States Attorney
Deputy Chief, Major Frauds Section

JOSEPH BEEMSTERBOER
Deputy Chief, Fraud Section
United States Department of Justice

DIIDRI ROBINSON
Assistant Chief, Fraud Section
United States Department of Justice

EMILY Z. CULBERTSON
Trial Attorney, Fraud Section
United States Department of Justice